**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALAN ROSSI and LAURA ROSSI, his wife, | CIVIL ACTION NO. 3:09-CV-876 |
| Plaintiffs, | |
| v. | (JUDGE CAPUTO) |
| PROGRESSIVE INSURANCE, | |
| Defendant. | |

### MEMORANDUM

This case considers whether the defendant insurer acted in bad faith when it failed to pay the plaintiffs' demand on an underinsured motorist claim. Because the evidence viewed in the plaintiffs' favor fails to show bad faith by clear and convincing evidence, the defendant's motion for summary judgment (Doc. 50) will be granted. Also before the Court is a motion to strike the plaintiffs' expert report. (Doc. 65.) Because judgment will be entered in favor of the defendant, the motion to strike the expert report is moot and thus will be denied.

### I. Background

On January 5, 2007, Alan Rossi turned his car left across oncoming traffic lanes and collided with an oncoming vehicle. Following the collision, Rossi demanded the policy limit of $30,000 for underinsured motorist coverage from Progressive. On April 8, 2009, Rossi and his wife filed the present action against Progressive in the Luzerne County Court of Common Pleas. They brought two claims: breach of contract and bad faith. Progressive

1

removed the action to federal court, invoking diversity-of-citizenship jurisdiction.

The parties resolved the breach of contract claim, and proceed solely on the bad faith claim. (*See* Doc. 27.)

Progressive moves for summary judgment. In accordance with Local Rule 56.1, Progressive filed a "separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." Rossi, however, neglected to respond in kind. Local Rule 56.1 dictates that "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required [of the movant], as to which it is contended that there exists a genuine issue to be tried."

Not only did Rossi fail to respond to Progressive's numbered statements, but the only statements of fact he included were interspersed throughout his brief, in bulleted (not numbered) paragraphs.[1] When a separate, responsive statement of facts is absent, Local Rule 56.1 clearly states the consequences: "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

Thus, the material facts set forth in Progressive's statement are deemed to be admitted by Rossi. *See Conn v. Bull*, 307 F. App'x 631, 633 (3d Cir. 2009) (holding that the

---

[1] Sixteen days after submitting its brief in opposition, the plaintiffs filed a document termed "Plaintiffs' Concise Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment." Not only was this filing untimely, but it fails to comply with Local Rule 56.1 because it does not respond to the defendant's statement of material facts and it lacks numbered paragraphs. Indeed, the plaintiffs only filed this statement after the defendant noted in its reply brief that because the plaintiffs failed to respond to its statement of undisputed material facts, its facts should be deemed admitted. The plaintiffs' statement (Doc. 60) is untimely and the Court declines to consider it for purposes of this motion.

District Court did not err in deeming admitted the facts in the movants' Local Rule 56.1 statement where the party opposing failed to include a separate statement responding to the numbered paragraphs in the moving party's statement); *Aubrey v. Sanders*, 346 F. App'x 847, 847 (3d Cir. 2008) (affirming district court's grant of summary judgment after deeming defendants' statements of material fact admitted because the plaintiff violated Local Rule 56.1). In keeping with the legal standard for summary judgment, these facts will be viewed in the light most favorable to Rossi.

As stated in Progressive's statement of material facts, and as viewed in the light most favorable to Rossi, the facts are as follows:

On January 5, 2007, Alan Rossi was involved in an automobile collision with Daniel McGroarty. At the time of the collision, Rossi had automobile insurance with Progressive. The policy provided stacked underinsured motorist (UIM) coverage with a limit of $15,000 per vehicle. Because the Rossis had two vehicles on the policy, their total UIM coverage was $30,000.

By letter dated February 26, 2008, the Rossis' attorney wrote to Progressive to place it on notice of an underinsured motorist claim and demand settlement for the policy limit of $30,000. In the letter, the attorney stated that Rossi injured his right and left shoulders as well as his lumbar and thoracic spines in the accident, and identified various medical professionals who had provided cared for Rossi. The letter also stated that Rossi had sustained a left rotator cuff tear in a prior motor vehicle accident and had been receiving Social Security Disability payments because of his manic depression since approximately 1995, and that the attorney was "in the process of securing the Medicare summary." The letter did not identify the amount of McGroarty's liability insurance coverage or the existence

of any claim Rossi might have for lost wages or lost earning capacity.

On March 3, 2008, Progressive assigned the claim to claims specialist Brett Katz. After reviewing the February 26, 2008 demand letter from Rossi's attorney, Katz replied on March 5, 2008. In his letter, Katz notified Rossi's attorney that he would be handling the UIM claim.

One week later, on March 12, 2008, Katz reviewed the police report, and documented that John Enders had witnessed the accident. Katz documented that the police report indicated that Enders heard McGroarty's car and saw McGroarty's vehicle go by, but that it did not appear that Enders saw the cars collide. Katz also documented that Rossi had indicated he saw McGroarty approaching in oncoming traffic before proceeding with his left turn.

Also on March 12, 2008, Katz spoke with a representative of McGroarty's insurer, Allstate, who advised Katz that McGroarty had $100,000 in coverage and Allstate was contesting liability. Allstate's representative confirmed that it assessed liability against Rossi for turning left in front of McGroarty and had estimated the full value of Rossi's claim at $20,000 to $25,000—an amount well within its $100,000 liability limit.

About six months later, on September 23, 2008, Katz reviewed a statement made by witness Enders, which Rossi's counsel forwarded to Progressive following a September 16, 2008 telephone conversation. Katz considered Enders's statement when assessing liability, but documented that Enders provided inconsistent descriptions of his location at the time of the accident and the sequence of the traffic light at the accident scene. After reviewing Enders's statement, Katz decided to obtain a scene investigation to assist in the liability assessment.

On September 25, 2008, a Progressive representative completed a scene investigation and documented that the traffic control device at the intersection where the accident occurred was a "red light, no left turn lanes or green arrows for turns." On October 6, 2008, Katz wrote to Rossi's counsel that he was "reviewing the prior representative's liability decision" and "expect[ed] to have this completed in the very near future."

A liability decision had previously been made when Progressive asserted a subrogation claim for the property damage payment against Allstate, McGroarty's insurer. The resulting inter-company arbitration on July 16, 2007 resulted in a finding that Allstate owed a 20% contribution because Rossi was 80% at fault for the accident. Pursuant to Rossi's property damage coverage, Progressive had made payment for a business sign belonging to a third party which was damaged in the accident.

In the October 6, 2008 letter from Katz to Rossi's lawyer, Katz stated that "[i]n order to properly evaluate your client's injury claim, I will need the following documentation: ER records from the date of loss; copies of MRI reports from the left and right shoulders; a current statement for any outstanding bills; and an account from Rossi on how his right shoulder was injured in this loss (if he can remember)." In the weeks after the letter had been sent, Katz followed up with Rossi's lawyer by placing phone calls on October 9, 10, and 28, and November 13, 2008.

On December 2, 2008, Katz wrote to Rossi's lawyer confirming a conversation with the lawyer's secretary. During this conversation, the secretary had stated that Medicare might assert a lien, but that Rossi's lawyer did not yet have information regarding the lien amount. In his confirmation letter, Katz notified Rossi's lawyer that this Medicare lien information would be necessary for Progressive's evaluation of Rossi's claim.

By way of letter dated December 29, 2008, Rossi's attorney wrote to Progressive, indicating that he would immediately forward to Progressive any information he received from Medicare regarding any liens that Rossi would be responsible for. The letter further notified Progressive that Rossi's attorney would be filing a Writ of Summons against Progressive on or before Janauary 4, 2009 in order to preserve Rossi's UIM claim, which was approaching the limitations period.

On January 6, 2009, Rossi's lawyer served Progressive with a Writ of Summons. Because of this filing, on January 7, 2009, Progressive's claim specialist Margaret Mary Burke was assigned to handle Rossi's UIM claim.

Katz forwarded his draft evaluation of Rossi's claim to Burke on January 9, 2009. In this draft, Katz documented that no lost wage claim had been submitted. He further noted that the "original liab[ility] decision was that [Rossi] was 60–80% at fault as [he was] making a left turn. Given wit[ness statement], can see liab[ility] at 40–60 % on either party. [Rossi vehicle] was making [a left] turn and [Rossi] admits to seeing [McGroarty] prior to beginning turn. [McGroarty, a minor, was DUI, speeding, heavy impact. Will give [Rossi] benefit of the doubt and eval[uate] at 60%" adverse to McGroarty.

In his deposition, Katz explained this liability determination:

> In my experience and quite frankly in every claim I have ever handled up until now, up until this particular claim, I have always found that the proximate cause and majority falls on the driver who was making the left-hand turn. I gave Mr. Rossi the benefit of the doubt in saying that because Mr. Enders could be correct and that there were contributing factors by Mr. McGroarty, that I was going to go beyond what I had normally done with liability assessments and place the majority on Mr. McGroarty.

Based on the information available to him when he was writing his draft evaluation, Katz had determined that even if Progressive disregarded liability and causation issues, the full value

6

of Rossi's damages was estimated to be between $31,000 and $52,000—an amount well within the range of McGroarty's $100,000 policy limit.

Having received Katz's draft evaluation, Burke performed a detailed review of it on January 12, 2009. Burke determined that an impediment to resolving the claim was the "issue as to liability as ins[ured] FTYROW [failed to yield right of way] while making a l[eft] turn in front of oncoming tortfeasor and tortfeasor's speed and DUI" remained at issue. Burke did not assign percentages of liability during this initial review; instead, she determined that deposition testimony from the Rossis, McGroarty, Enders, and the investigating police officer would help clarify the liability assessment. She noted an apparent inconsistency: Enders had told Rossi's lawyer that Rossi had a green light and McGroarty had a yellow light; but this arrangement was not possible given the light sequence. Burke also documented that she was uncertain whether Rossi's right shoulder tear was related to the accident. She also documented the need to resolve uncertainty as to the extent the accident aggravated Rossi's prior left shoulder injury and depression by obtaining updated medical and billing information.

On January 27, 2009, Progressive's UIM counsel Charles Stokes wrote a letter asking the Rossis to file a complaint and provide documentation regarding their claim. On February 24, 2009, Stokes wrote again to Rossi's attorney and asked for a status update on Rossi's claim. On March 3, 2009, Rossi's lawyer forwarded information to Progressive showing a total Medicare lien of $6,650.06. That same day, Burke spoke with Rossi's attorney and advised him that liability was at issue and that she needed additional documentation regarding Rossi's damages.

On April 3, 2009, Stokes wrote to Rossi's attorney and noted that "liability has been a significant consideration, and a potential issue, since the inception of this claim. Moreover,

we see no indication that Mr. Rossi's claim has been evaluated as one which, taking all pertinent factors into account, would necessarily exceed the limits of Mr. McGroarty's liability coverage." He further noted that discovery was necessary, and that the investigation was ongoing.

On May 22, 2009, McGroarty was deposed in relation to Rossi's case against McGroarty. McGroarty testified that Rossi was at fault for the accident. He testified that he (McGroarty) entered the intersection when the light was green, and that Rossi turned left in front of McGroarty's vehicle.

On August 19, 2009, Stokes notified Progressive that McGroarty had stopped cooperating in his own defense, and that he had learned from McGroarty's attorney that McGroarty had assigned his rights against Allstate, and had been promised a percentage of everything collected in subsequent litigation in excess of $100,000.

On August 21, 2009, Stokes wrote to Rossi's attorney, enclosing authorizations for medical records.

Progressive arranged for the deposition of police officer Cywinski, who had investigated the motor vehicle accident, and Progressive's representative reviewed a summary of the deposition on September 1, 2009.

On September 1, 2009, Burke documented that a deposition of Enders was scheduled for October 2009 and a deposition of Rossi was scheduled for November 2009. In September 2009, Rossi's counsel first asserted a loss of earning capacity claim. On September 3, 2009, Stokes wrote to Rossi's lawyer. He enclosed supplemental interrogatories and requests to produce documents regarding Rossi's out-of-pocket medical expenses and the recently asserted claim for lost earning capacity.

On October 28, 2009, Stokes wrote to Progressive. He enclosed updated records and answers to supplemental interrogatories received from Rossi's counsel. Stokes stated "that there actually is no documented medical opinion to the effect that Rossi was either fit to return to work or on his way to becoming fit prior to the accident, and there is no documented evidence, from an expert medical standpoint, that the accident has left him impaired from pursuing work for which he would otherwise be fit."

Stokes compiled a summary of Rossi's Social Security Disability file, which he shared with Progressive on November 11, 2009. In it, Stokes informed Progressive that the Social Security records revealed that as of the time of the accident, "the Social Security Administration finds that the 'medical evidence documents a disabling mental condition which prevented the claimant from engaging in work related activity. Current evidence shows that the claimant's mental impairment has shown no significant improvement. He is not capable of engaging in any type of work related activity.'" Stokes additionally noted that the Social Security Administration's finding was "dated just six days after the subject accident, and is clearly based on testing and other inquiries which pre-dated the accident." Stokes documented that in a report of continuing disability dated January 6, 2006—a year before the accident—Rossi had complained of shoulder injury and extreme shoulder pain.

On November 23, 2009, Rossi's treating physician, Dr. Kim, wrote to Rossi's counsel. Dr. Kim opined that Rossi's prognosis for returning to a pre-accident state with regard to his shoulder symptoms was good, and that no further shoulder surgery was anticipated.

On December 2, 2009, Progressive agreed to stipulate that liability on the UIM policy would not be disputed at trial. Progressive did so for four reasons: several of the depositions were completed; McGroarty was not cooperating with his attorney; McGroarty did not appear

to Progressive to be credible and had executed an assignment of his rights against Allstate—thus, he had a financial interest in an unfavorable verdict; and finally, the stipulation would limit the potential for inflated compensatory damages that could result from the presentation of evidence that McGroarty had been driving under the influence. Based on the anticipated cost of defense, on December 3, 2009, Progressive wrote to Rossi's attorney and offered $10,500 to settle Rossi's UIM claim.

Burke called Rossi's lawyer on December 3, 2009 to inform him that Progressive would continue to review Rossi's claim. He further informed him that Progressive would obtain an independent medical examination to help clarify the extent of Rossi's medical restrictions. During this phone call, Burke asked for any additional medical records. That same day, Stokes wrote to Rossi's lawyer and enclosed authorizations for the release of medical records.

Also on December 3, 2009, Burke gave Stokes the authority to obtain an independent medical examination. Burke relied on counsel to select the physician.

By way of letter dated December 7, 2009, Rossi's attorney rejected Progressive's $10,500 settlement offer. The following day, Stokes forwarded records to Dr. Cronkey so that he could conduct an independent medical examination of Rossi.

On December 29, 2009, Stokes's paralegal wrote to Rossi's attorney, noting that Progressive still had not received the executed authorizations for medical records that had been sent on December 3, 2009. On January 12, 2010, Stokes's paralegal wrote once again to Rossi's attorney, noting that the authorizations still had not been received.

On January 20, 2010, Progressive received the report prepared by Dr. Cronkey following his examination of Rossi. The report opined that Rossi's "ongoing care by Dr. Kline

and his ongoing chiropractic treatment are for conditions not related to the accident under review," and responded in the negative to the question asking whether Rossi was "disabled in any manner as a result of any injuries or conditions" caused by the accident.

This report was forwarded on January 20, 2010 to Rossi's counsel. On January 21, Burke noted that she believed the value of the claim might not trigger UIM coverage, but that "there is a risk, if a jury were to believe ongoing complaints and inability to work are related to [the accident], an award may be more than [McGroarty's liability limit]." That same day, Progressive wrote and called Rossi's counsel, offering $15,000 to settle Rossi's UIM claim.

In a letter dated January 22, Progressive's offer was rejected. That same day, Rossi's counsel forwarded a vocational rehabilitation report from Danmar Associates to Progressive.

In a letter dated February 5, 2010, Stokes wrote to Drs. Kim and Raymond, asking for records in response to the executed authorization he had forwarded on January 15, 2010.

During a telephone conversation on February 9, 2010, Burke offered $20,000 to settle Rossi's UIM claim. Burke also agreed to coordinate expert depositions to avoid duplicating costs. On February 9, 2010, Burke confirmed in a letter Progressive's $20,000 settlement offer and advised Rossi's counsel that the offer reflected Progressive's estimate of trial expenses.

On February 12, Richard Baine completed a vocational examination of Rossi, opining that:

> Mr. Rossi has not endured a loss of earning capacity of any type as he was unemployed at the time of the accident. [I]n addition, he had not been employed in any capacity due to a pre-existent mental health disorder which the Social Security Administration determined met the criteria to be awarded Disability Insurance Benefits since June of 1995.

On February 15, 2010, Progressive gave Stokes authority to settle the UIM claim for

11

the $30,000 UIM policy limit.  The following day, Stokes sent a letter in which he offered to tender the $30,000 policy limit. Two days later, on February 18, 2010, Stokes forwarded a $30,000 settlement draft to Rossi's attorney.

At the time of Rossi's February 18, 2010 settlement with Progressive, Rossi had not settled or otherwise resolved his claim against McGroarty. Allstate settled the claim against McGroarty for a total of $131,567.82. Of this amount, $31,567.82 is described as costs and fees.

The Rossis point to additional facts in the record, which are stated in the following paragraphs. During the time that Mr. Katz was handling the claim, he never spoke with an independent witness or attempted to take the statement of John Enders, nor did he authorize any other investigator to do so, although Allstate had sent Progressive a copy of Enders's statement.  In this statement, Enders indicated that McGroarty was driving at a speed of 55 to 60 miles per hour as the light was turning yellow, and then accelerated into the intersection. The evidence additionally showed that McGroarty was intoxicated and underage. Nevertheless, in his deposition Katz noted that the fact that Rossi was turning left could place a substantial percentage of negligence on Rossi. Also, during the time Katz handled the claim, he did not consult with an accident reconstructionist, hire an investigator to look at the collision scene, or perform a lighting sequence timing.  However, a local Progressive representative looked at the accident scene. In placing liability in question, Katz did have any knowledge of the measurements of the intersection, site distances, or traffic lanes—Katz never took any of these measurements, nor did he order anyone else to do so.

Despite the fact that the nature of the injuries never changed, and correspondence was exchanged between Katz and the Rossis' attorney, no liability determination or

assessment of liability was ever made in writing, although Katz testified that he verbally spoke with the Rossis' attorney regarding liability. Also, an October 6th letter indicated that Katz was in the process of reviewing the prior representative's liability decision, which Katz explained was referring to a previous verbal conversation (the letter itself mentioned the previous conversation that day).

Ms. Burke's deposition largely echoed Katz's; Rossi relies on it to suggest that Progressive failed to conduct as thorough and rapid an investigation as would be appropriate for the case. The Progressive claims manual mentions that there are time where accident reconstructionists are retained, but Burke claimed that there is no blanket rule about retaining a reconstructionist whenever liability is at issue. She acknowledged that an accident reconstructionist was never retained in connection with the Rossi accident. Additionally, Progressive never canvassed the neighborhood to determine if there were any other witnesses to the accident. She indicated that on March 3, 2009 she spoke to Rossi's counsel and explained that liability was unclear and that she wanted to investigate the accident, because liability is often assessed against the individual turning left, even though it is not *per se* illegal in Pennsylvania to make a left turn.

The deposition of Brian Haeflein, the supervisor in the claim, indicated that there were some discussions about keeping McGroarty's alcohol intake out of the case (Haeflin explained that this was because punitive damages were unavailable), even though intoxication could impact whether McGroarty was negligent. Haeflin was also unaware of any communications with the subrogation department about the case. Additionally, Haeflin was unaware of any investigation into whether Rossi would have had enough time to complete his left turn had McGroarty been driving the speed limit.

Stokes's deposition echoed that of the others: neither McGroarty's nor Enders's depositions were not taken; an accident reconstruction expert was not hired; and a speed analysis, stopping distance analysis, or site distance analysis were not performed.

## II. Discussion

**A. Legal Standard on Summary Judgment**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her

case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## B. Bad Faith Insurance Claim

An insurer has a duty to act in the "utmost good faith" towards its insured. *Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa. Super. 545, 646 A.2d 1228, 1231 (1994) (quoting *Fedas v. Ins. Co. of Pa.*, 300 Pa. 555, 558, 151 A. 285, 286 (1930)). This duty "arises because the insurance company assumes a fiduciary status by virtue of the policy's provisions which give the insurer the right to handle claims and control settlement." *Id.* (internal citation omitted). When the Pennsylvania courts declined to create a common-law remedy for an insurer's bad faith conduct, the Pennsylvania Legislature responded by enacting what is often referred to as the "bad faith statute," codified at 42 Pa. C.S.A. § 8371. Under this statute, when a "court finds that an insurer has acted in bad faith toward[s] the

insured," a court may apply any of the following remedies:

> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S.A. § 8371.

"Bad faith" encompasses a variety of improper conduct. Pennsylvania courts have looked to the following definition when determining whether an insurer's conduct rises to the level of bad faith:

> "Bad faith" on the part of [the] insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Romano*, 646 A.2d at 1232 (quoting Black's Law Dictionary 139 (6th ed. 1990) (other citations omitted)).

Thus, bad faith can be shown when an "insurer did not have a reasonable basis for denying benefits under the policy and [ ] the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. 1999) (quoting *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa. Super. 1997)). An action in bad faith also extends to the insurer's investigation; conduct that violates the Unfair Insurance Practices Act may rise to the level of bad faith. *Id.* (citing *Romano*, 646 A.2d at 1233 (1994)). Moreover, an insurer's duty of good faith does not end "upon the initiation of suit by the insured," but continues during the pendency of the litigation.

16

*Id.*

Mere bad judgment or negligence, however, does not constitute bad faith. *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 501 (Pa. Super. 2004) (citing *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033. 1036 (Pa. Super. 1999)). Instead, "the insurer's conduct must be such as to 'import[] a dishonest purpose;'" and the "plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill will." *Id.* In keeping with this standard, courts have declined to find bad faith where an insurer made a reasonable estimate of its insured's losses, even where that estimate ultimately proves to be too low. *Brown*, 860 A.2d at 501 (citing *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680, 688–89 (Pa. Super. 1994)).

The plaintiff must prove bad faith by clear and convincing evidence. *O'Donnell*, 734 A.2d at 906 (quoting *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa. Super. 1997)).

Turning to the present case, and viewing the evidence in Rossi's favor, no reasonable fact-finder could find that Rossi has proven Progressive's bad faith by clear and convincing evidence. Progressive continued its investigation in an objectively reasonable manner, even if it did not move as quickly as Rossi would have liked. No evidence suggests dilatory conduct, dishonesty, obfuscation, or malice. Because Rossi failed to yield the right-of-way, it was reasonable for Progressive to investigate liability—notwithstanding the fact that McGroarty was driving while intoxicated and speeding. In light of Progressive's knowledge that Rossi had been unemployed for some time and was receiving payments after having been adjudicated disabled, it was also reasonable for Progressive to dispute Rossi's damages. Indeed, from Progressive's vantage point, it was doubtful that Rossi's injuries

17

would even implicate the UIM policy, as it appeared that Rossi's documented out-of-pocket medical expenses were well within the $100,000 threshhold of McGroarty's policy limit. In the absence of a viable loss-of-earnings claim, it would have appeared to Progressive that Rossi could be made whole without resorting to a UIM claim.

Rossi argues that Progressive's conduct in contesting liability on the "sole" basis that Rossi made a left turn was improper because making a left turn at that intersection "was not in and of itself illegal." However, it is undisputed that McGroarty would have had the right-of-way and that Rossi failed to yield. Although some evidence suggested that McGroarty may have accelerated into the intersection at a high rate of speed, it was reasonable for Progressive to question whether Rossi's negligence was a substantial contributing factor to the collision. Indeed, an inter-company arbitration found Rossi's contributory negligence to be 80%.  In light of these facts, no reasonable inference of bad faith can be drawn from Progressive's investigation of liability.

Rossi also argues that the incident was not fully investigated as quickly and fully as it ought to have been. However, considering the lack of evidence that Rossi's injuries would exceed the amount covered by McGroarty's policy, the pace and scope of Progressive's investigation does not suggest bad faith.

Finally, Rossi argues that because his attorney was not clearly told until March 3, 2009, that liability was at issue, Progressive behaved in a dilatory manner that permits an inference of bad faith. However, the uncontroverted facts show that Progressive had investigated liability before this time.  These facts also show that because the estimated value of Rossi's claim did not appear to exceed $100,000, Progressive lacked any clear evidence or documentation that the UIM coverage would be triggered.

Rossi has failed to point to facts showing that Progressive acted with an improper motive. Thus, summary judgment is appropriate and will be granted in favor of Progressive.

### III. Conclusion

For the reasons stated above, Progressive's motion for summary judgment (Doc. 50) will be granted, and judgment will be entered in favor of Progressive and against the Rossis. The motion to strike the plaintiffs' expert report (Doc. 65) will be denied as moot. An appropriate order follows.

April 25, 2011  /s/ A. Richard Caputo
Date  A. Richard Caputo
  United States District Judge

19

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALAN ROSSI and LAURA ROSSI, his wife, | |
| Plaintiffs, | NO. 3:09-CV-876 |
| v. | (JUDGE CAPUTO) |
| PROGRESSIVE INSURANCE, | |
| Defendant. | |

## **ORDER**

**NOW**, this 25th day of April, 2011, **IT IS HEREBY ORDERED** that the defendant's motion for summary judgment (Doc. 50) is **GRANTED**.  Judgment shall be entered in favor of the defendant. The defendant's motion to strike (Doc. 65) is **DENIED** as moot. The clerk of court is directed to mark this matter **CLOSED**.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge